UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ALY RICHARDSON, et al., | : | Civil Action No. |
|  | : | 08-2905 (NLH) |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| CHARLES ALBINO, et al., | : |  |
|  | : |  |
| Defendants. | : | O P I N I O N |
|  | : |  |

APPEARANCES:

ALY RICHARDSON, S.P.# #572359
Plaintiff Pro Se
Southern State Correctional Facility
Delmont, New Jersey  08314

**Hillman, District Judge**

Plaintiff  ALY RICHARDSON a/k/a RASHEED SALEEM ("Plaintiff"),

a prisoner currently confined at the Southern State Correctional

Facility, Delmont, New Jersey, seeks to bring this 42 U.S.C. § 1983

action in forma pauperis without prepayment of fees, pursuant to 28

U.S.C. § 1915(a).[1]  See Docket Entry No. 1.  Plaintiff submitted

---

[1]  Plaintiff's Complaint lists, as additional plaintiffs in
this action, the following individuals: Rasheed Saleem, Omar
Rhodes, Raheem Blyther, Royal Hayes and Muhammad Irving.  See
Docket Entry No. 1, at 5.  The Complaint, however, is written
solely on behalf of Plaintiff, see id. at 6, 8-9, and factual
references to the above-listed additional plaintiffs are limited
to a single statement that Mr. Saleem was present during an
inquiry made by plaintiff with the prison officials on an
unspecified date.  See id. at 8.  Moreover, while the "Relief"
section of the Complaint uses the pronoun "we," no references are
made in the body or caption, or the "Relief" section of the
Complaint to an application for certification of a class or to a
joinder of the above-listed plaintiffs.  Furthermore, the
accompanying application to proceed in forma pauperis states that

for filing his complaint ("Complaint"), together with a complete application to proceed <u>in forma pauperis</u>. <u>See</u> Docket Entry No. 1. Based on his affidavit of poverty, prison account statement, and the absence of three dismissals within 28 U.S.C. § 1915(g), the Court: (1) grants the application to proceed <u>in forma pauperis</u>; (2) directs the Clerk to file the Complaint; (3) assesses the $350.00 filing fee against plaintiff; (4) directs the agency having custody of plaintiff to deduct an initial partial filing fee from his prison account and to forward same to the Clerk, when funds exist; and (5) directs the agency having custody of plaintiff to forward payments from his prison account to the Clerk each subsequent month that the amount in the account exceeds $10.00, until the $350.00 filing fee is paid in full.[2]  <u>See</u> 28 U.S.C. § 1915(a), (b).

---

the claims are being brought solely by plaintiff. <u>See</u> Docket Entry No. 1-2, at 1. Finally, the Complaint bears only plaintiff's signature, even though the Complaint form unambiguously directs that "each plaintiff named in the Complaint <u>must</u> sign the Complaint . . . . Remember, <u>each</u> plaintiff must sign the Complaint." <u>See</u> Docket Entry No. 1, at 9. In light of the foregoing, this Court deems any class action or joinder analysis unwarranted and construes the Complaint as plaintiff's individual pleading.

[2]  None of the additional plaintiffs listed by plaintiff submitted an <u>in forma pauperis</u> application. Having no certainty as to the level of involvement of these additional plaintiffs in this action (and indeed no information that they are even aware of this action) this Court finds it improper to hold these additional plaintiffs financially responsible for the costs associated with this matter.

2

Having thoroughly reviewed plaintiff's allegations, in accordance with the requirements of 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a), this Court will dismiss the Complaint for failure to state a claim upon which relief may be granted.

## I.  Standard of Review

In 1996, Congress enacted the Prison Litigation Reform Act ("PLRA"), Title VIII of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (April 26, 1996). Congress's purpose in enacting the PLRA was "primarily to curtail claims brought by prisoners under 42 U.S.C. § 1983 and the Federal Tort Claims Act . . . many of which are routinely dismissed as legally frivolous." Santana v. United States, 98 F.3d 752, 755 (3d Cir. 1996). A crucial part of the congressional plan for curtailing meritless prisoner suits is the requirement, embodied in 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), that a court must dismiss, at the earliest practicable time, any prisoner actions that are frivolous or malicious, fail to state a claim, or seek monetary relief from immune defendants.

In determining the sufficiency of a complaint, the Court must be mindful to construe it liberally in favor of the plaintiff. See Haines v. Kerner, 404 U.S. 519 (1972); United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992). The Court should "accept as true all of the allegations in the complaint and reasonable inferences that

can be drawn therefrom, and view them in the light most favorable to the plaintiff." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997). This Court need not, however, lend credit to a pro se plaintiff's "bald assertions" or "legal conclusions." Id. The Court of Appeals for the Third Circuit recently provided guidance as to the kinds of allegations which qualify as pleadings sufficient to pass muster under the Rule 8 standard:

> "While a complaint . . . does not need detailed factual allegations, a plaintiff's [Rule 8] obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." [Bell Atl. Corp. v.] Twombly, 127 S. Ct. [195,] 1964-65 [(2007)]. Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." Id. at 1965 n.3. . . . [In fact,] the Supreme Court [expressly] disavowed certain language that it had used many times before -- the "no set of facts" language from [a pre-Twombly case]. See id. at 1968.

See Phillips v. County of Allegheny, 515 F.3d 224, 230-34 (3d Cir. 2008)(original brackets removed).


II. **Plaintiff's Allegations**

Plaintiff is alleging a violation of his Free Exercise and Equal Protection rights because the New Jersey Department of Corrections does not "provide Muslim [i]nmates with Halal [p]repackaged meals to same way [the Department] provide[s] Jewish inmates with prepackaged [K]osher meals." Docket Entry No. 1, at 9. Plaintiff's Complaint does not state that he himself is a

4

Muslim, or that he sincerely holds Muslim beliefs, but it appears that plaintiff is of Muslim faith, since he refers to Halal meals as a "requirement of our faith."   See id. at 6.

Granting plaintiff's Complaint the benefit of the doubt and construing it liberally in his favor, this Court presumes that plaintiff's religious beliefs are sincere, and that his faith is such that plaintiff cannot consume Kosher meals made available by the Department of Corrections.[3]

However, even with such allowances, Plaintiff's Complaint fails to state a claim.   The very claim presented in Plaintiff's Complaint - that the constitution requires the defendants to provide him with Halal meat meals - was addressed and conclusively rejected by the Court of Appeals in Williams v. Morton, 343 F.3d 212 (3d Cir. 2003).[4]   The plaintiffs in Williams, as with the

---

[3]   Plaintiff's Complaint does not specify whether his religious beliefs allow him consumption of Kosher meals.   See generally, Docket Entry No. 1.   The Complaint is also silent as to whether Plaintiff ever requested Kosher meals, as well as whether such request was denied by Plaintiff's prison officials. See id.   Kosher and Halal foods are similar, since both prohibit the use of pork, pork products and blood in food.   However, there are differences which may be significant to plaintiff. See <<http://www.eHalal.org>>.

[4] Since the Complaint indicates that plaintiff made inquiries as to the administrative basis and constitutional validity of the Department of Corrections' Halal meals policy with the Classification Committee at his facility, as well as with his religious leader, Imam Shakur, but received no explanations other than the statement that "the Department of Corrections for the State of New Jersey will not do anything to accom[mo]date Muslim Inmates for Halal [m]eals," this Court finds it prudent to attach to this Opinion, for plaintiff's

5

plaintiff here, were Muslim inmates who filed a 42 U.S.C. § 1983 action alleging that the defendant prison officials violated the plaintiffs' federal and state constitutional rights and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 et seq., by providing the plaintiffs with vegetarian meals rather than meals with Halal meat.   The Court of Appeals agreed with the District Court that the decision of the Department of Corrections to provide vegetarian meals to religious Muslim inmates (rather than Halal meals with meat) was rationally related to the legitimate penological interests in simplified food service, security, and staying within the prison's budget.[5]   The Court of Appeals noted that the Free Exercise aspect of the plaintiffs' claim was assessed in light of the facts that Muslim inmates were provided with the opportunity to pray daily, attend special weekly services, and observe religious holidays.   Turning to the equal protection aspect, the Court of Appeals concluded that the

_____

convenience, a copy of the careful and detailed discussion of this issue provided by the Court of Appeals in Williams.

[5] The Court of Appeals noted that there was sufficient evidence that providing Halal meat meals to hundreds of prisoners would have had a marked effect on the prison community and that--unlike Kosher meals--Halal meat meals could not be provided at a de minimis cost.   See Williams, 343 F.3d at 221; accord <<http://www.adherents.com/misc/adh_prison.html>> (indicating that, on national average, Muslim prison population has been at least 400% greater than the Jewish one); see also <<http://www.state.nj.us/corrections/media_watch/2003/031103_Prison_meal_program.html>> (stating that, in New Jersey at the time of the Court of Appeals' Williams decision, the cost of regular meals per inmate per day was $3.08).

plaintiffs failed in their claim because there was no evidence that the Kosher meals provided to Jewish inmates contained meat.

Here, as with the plaintiffs in <u>Williams</u>, plaintiff does not assert that he is denied the opportunity to pray daily, attend special weekly services, and observe religious holidays.   <u>See generally</u>, Docket Entry No. 1.   Similarly, Plaintiff does not assert that Jewish inmates are provided with Kosher meats; rather, he only asserts that they are provided with prepacked Kosher meals. <u>See id.</u> at 6, 8-9. In light of this silence, it appears to this Court that plaintiff's complaint alleges the same facts considered and determined by the Court of Appeals in <u>Williams</u> to be insufficient to establish a federal claim. In <u>Williams</u>, as here, the Complaint asserts that the defendant's offer of vegetarian meals is insufficient to meet plaintiff's religious needs.   The <u>Williams</u> court, and the court below, heard and rejected this precise claim. Absent a different claim legally or factually, there is no basis for this court to allow this plaintiff to retry this rejected theory. <u>Williams</u>, 343 F.3d at 219 (decision of Department of Corrections to provide vegetarian meals (rather than Halal meals with meat) rationally related to legitimate penological interests)⁶.   In sum, we conclude that, as drafted, plaintiff's

---

⁶   The Court of Appeals in <u>Williams</u> noted the trial court's evidentiary finding that the employees of the Department of Corrections strive to stay within the Department's tight budget and, consequently, must control "what [the facilities] prepare, cook and serve." <u>Williams</u>, 343 F.3d at 219.   The Department was

allegations that his First and Fourteenth Amendments rights are violated by the decision to provide only vegetarian meals instead of prepackaged Halal meals with meats fails to state a cognizable claim.

The Court, however, recognizes that the trial court's decision in Williams and ultimately affirmed by the Court of Appeals was entered at the stage of summary judgment rather than that of sua sponte dismissal. Moreover, the Court is mindful of the Supreme Court's teaching that "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Foman v. Davis, 371 U.S. 178, 182-83 (1962). Therefore, this Court cannot rule out the possibility that Plaintiff, if given an opportunity to amend his Complaint, may assert facts indicating that his conditions of confinements or his claim differ meaningfully from those decided in Williams.

Consequently, the Court finds it prudent to allow Plaintiff an opportunity to cure the shortcomings of his instant Complaint - if he can - and submit an amended pleading detailing the facts

---

and is responsible for 14 major institutions; as of now, these facilities collectively house approximately 23,000 inmates at the average annual institutional cost per inmate of approximately $34,600. In short, this complaint fails to allege any facts which would undermine, or call into question, the factual determinations relied upon in the Williams.

indicating, in light of the constitutional analyses provided by the Court of Appeals in <u>Williams</u>, that plaintiff's civil rights have been violated by a need to consume vegetarian meals.

> The [Supreme] Court explained that a plaintiff must "nudge [his or her] claims across the line from conceivable to plausible" . . . . [<u>Twombly</u>,] 127 S. Ct. at 1974. . . . This " does not impose a probability requirement at the pleading stage[]" but . . . "calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. <u>Id.</u>

<u>Phillips</u>, 515 F.3d at 233-34 (original brackets removed).[7]

## III. <u>Conclusion</u>

For the reasons set forth above, Plaintiff's Complaint will be dismissed without prejudice to Plaintiff's filing an amended complaint within 30 days.  An appropriate Order accompanies this Opinion.

*Noel L. Hillman*
**NOEL L. HILLMAN**
**United States District Judge**

Dated: *October 7, 2008*
At Camden, New Jersey

---

[7]   To that effect, the Court emphasizes that plaintiff, at the instant stage, need not conduct any discovery, and his amended pleading shall state the facts that plaintiff either knows to be true or with respect to which plaintiff has <u>bona fide</u> belief that these facts are correct, even if plaintiff has no first-hand knowledge or absolute certainty about the information conveyed.  By the same token, plaintiff shall not incorporate in his amended pleadings any facts that he knows to be untrue or those with respect to which plaintiff has a <u>bona fide</u> belief that such facts are untrue.

**JAMES WILLIAMS; ISHMON STALLWORTH, Appellants v. WILLIS E. MORTON; J. BLACKSTONE; F. JONES; ROY L. HENDRICKS; WALTER WISE; FRANK GRAVES**

No. 02-3653

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*343 F.3d 212*

**June 26, 2003, Argued**
**September 9, 2003, Filed**

**PRIOR HISTORY:**   On Appeal from the United States District Court for the District of New Jersey. (D.C. No. 98-cv-04310). District Judge: Hon. Garrett E. Brown, Jr.

**COUNSEL:** Christopher J. Michie, John Bellwoar (Argued), Dechert, Price & Rhoads, Princeton, N.J., Attorneys for Appellants. David Samson, Attorney General of New Jersey, David M. Ragonese (Argued), Deputy Attorney General of New Jersey, Patrick DeAlmeida, Deputy Attorney General of New Jersey, Trenton, N.J., Attorneys for Appellees.

**JUDGES:** Before: SLOVITER, AMBRO, Circuit Judges, and TUCKER,* District Judge.

> *   Hon. Petrese B. Tucker, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

SLOVITER, *Circuit Judge.*

Before us is the appeal by prisoners from the order of the District Court granting summary judgment to prison officials and employees as to the prisoners' claims that their constitutional rights to the free exercise of religion and equal protection have been violated by the prison's failure to provide them with meals they contend are required by their religious beliefs. We further consider whether the District Court abused its discretion by admitting the declaration and deposition testimony of a witness into the summary judgment record.

I.

**BACKGROUND**

Plaintiffs Ishmon Stallworth and James Williams ("Prisoners"), inmates at the New Jersey State Prison ("NJSP"), filed suit against Willis E. Morton, Roy Hendricks, Walter Wise, and Frank Graves ("Prison Officials"), all of whom are either former or current NJSP officials, in the United States District Court for the District of New Jersey pursuant to *42 U.S.C. § 1983*. The crux of Prisoners' claims is that the Prison Officials violated their constitutional rights by failing to provide them with Halal meat meals in conformity with their religious beliefs. A Halal, or lawful, diet includes fruits, vegetables, seafood, and meat from herbivorous animals such as cows and chickens that are properly slaughtered. The opposite of Halal food is Haram food, which is prohibited or unlawful and includes pork and meat from carnivorous animals. Halal foods can become contaminated if they are commingled with Haram items.

Currently, the different diets provided by the NJSP fall into four general categories: (1) a regular meal which is served to approximately 600 inmates; (2) a series of health-related diets with low sodium, low cholesterol, and reduced calories which are served to about 350 inmates; (3) a Kosher diet that is provided to 4 Jewish inmates; and (4) a religious

vegetarian diet served to approximately 225 inmates who cannot eat the regular prison diet for religious reasons. [1] The regulation creating the religious vegetarian meal reads:

> An inmate who cannot eat the food served to the general population because of the inmate's religious beliefs may request a religious vegetarian diet. Upon review and approval of the request by the Chaplain of the correctional facility in accordance with this subchapter, nutritionally balanced vegetarian meals shall be provided to the inmate in place of the food served to the general population.

N.J.A.C. § 10A:17-5.9

1   The description of the various diets offered at NJSP comes from the deposition testimony of Lorenza Graves, the prison's food service supervisor.

On behalf of themselves and other Muslim inmates, Prisoners contend that, as applied, this regulation violates their sincerely held religious belief that they are required to consume Halal meat in their diet. Their complaint alleges that the Prison Officials violated their rights under the *Free Exercise Clause of the First Amendment* [2] by not providing them with Halal meat and the *Equal Protection Clause of the Fourteenth Amendment* [3] by providing Kosher meals with meat to Jewish prisoners without providing Halal meat to Muslim inmates. They further claim that the Prison Officials violated their rights under the New Jersey Constitution and the New Jersey Law Against Discrimination, *N.J. Stat. Ann. § 10:5-1 et seq.* Prisoners requested an injunction that would require the NJSP to include Halal meat in their diet and damages for the alleged violations of their constitutional rights. [4]

2   The *First Amendment* provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." U.S. Const. amend. I.

3   The *Fourteenth Amendment* reads in relevant part: "Nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

4   In their appellate brief, Prisoners refine their request as seeking "to compel NJSP to include Halal meat in at least some of the Halal meals provided Muslim prisoners." Br. of Appellants at 8.

Analyzing Prisoners' constitutional claims under the four-part test enunciated by the Supreme Court in *Turner v. Safley, 482 U.S. 78, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987)*, the District Court granted the Prison Officials' motion for summary judgment. [5] Prisoners timely appealed.

5   It should be noted that the District Court denied the Prison Officials' summary judgment motion as to Prisoners' claims that their *First Amendment* rights were violated by several past instances of contamination of their current vegetarian diet. However, Prisoners dismissed this claim in order to expedite their appeal of the claims denied by the District Court. Accordingly, this issue is not before us.

II.

**DISCUSSION**

**A. Jurisdiction and Standard of Review**

We have jurisdiction to hear this appeal pursuant to *28 U.S.C. § 1291*. We exercise plenary review over the District Court's decision to grant summary judgment. *DeHart v. Horn, 227 F.3d 47, 50 (3d Cir. 2000)* (en banc). Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* We must view all evidence and draw all inferences therefrom in the light most favorable to the nonmoving party, here Prisoners. *Id.*

**B. Free Exercise Claim**

As to their free exercise claim, Prisoners concede that the District Court applied the correct test as enunciated in *Turner* but argue that it incorrectly applied that test to the facts in the record. According to Prisoners, there is sufficient evidence creating a genuine issue of material fact as to whether the *Turner* factors weigh in favor of the Prison Officials, thereby making summary judgment inappropriate.

In *Turner*, the Supreme Court considered the proper standard under which courts are to review prison regulations that are challenged on constitutional grounds. The Court considered two somewhat competing principles, the first of which is that federal courts "must take cognizance of the valid constitutional claims" of inmates. *Turner, 482 U.S. at 84*. This judicial cognizance notwithstanding, courts must remember that they are "ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id.* (citation omitted). Bearing these dual principles in mind, the Court concluded that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id. at 89*.

Thereafter, the *Turner* Court provided the following four factors to consider when applying its newly enunciated reasonableness standard:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. . . . A second factor relevant in determining the reasonableness of a prison restriction . . . is whether there are alternative means of exercising the right that remain open to prison inmates. . . . A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. . . . Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

*Id. at 89-90.*

Furthermore, the burden is not on the state to prove the validity of the challenged prison regulation but instead is on the inmate to disprove it. *Overton v. Bazzetta, 539 U.S. 126, 156 L. Ed. 2d 162, 123 S. Ct. 2162 (2003)* (applying *Turner* and upholding prison regulations limiting prisoner visitation rights).

We have held that a prerequisite to the application of *Turner* is the assertion of "only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection." *DeHart, 227 F.3d at 51*. The Constitution does not protect "mere assertion[s] of . . . religious beliefs." *Id.* The Prison Officials argue that it is also a prerequisite for the inmate to establish that the challenged prison policy "substantially burdens" his or her religious beliefs. Br. of Defendants at 24. There is no support for that assertion. Because the Prison Officials fail to provide us with any reason to doubt that Prisoners sincerely believe that Islam requires them to eat Halal meat, it follows that we must determine whether the prison's practice of not providing Halal meat meals is reasonable under *Turner.*

**1. Legitimate Penological Interests**

The District Court held that NJSP's decision to provide a vegetarian meal, rather than one with Halal meat, is rationally related to legitimate penological interests, namely simplified food service, prison security, and budgetary constraints. According to the District Court, if the prison were required to provide Halal meat, prison officials would have to coordinate a new program for food service that would require more kitchen help and could potentially cause problems between prisoners. It further found "no evidence of record" showing that Halal meat could be provided to the more than 200 inmates who currently receive the religious diet in a cost efficient manner or within the prison's budget. App. at 21.

Prisoners do not dispute that simplified food service, security, and budget constraints are legitimate penological interests. Indeed, our prior decisions preclude such an argument. *See Fraise v. Terhune, 283 F.3d 506, 517-18 (3d Cir.*

*2002)* (finding security to be a legitimate penological interest); *DeHart, 227 F.3d at 53* (finding simplified food service to be a legitimate penological interest). Instead, Prisoners contend that the evidence raises an issue of fact for the jury regarding whether these interests would be adversely affected by the addition of Halal meat meals.

With respect to simplified food service, Prisoners argue that the District Court overlooked the testimony of Lorenza Graves. They point to Graves' statement that it "would be no great problem" to serve Halal meat received from an outside vendor to the inmates who now receive vegetarian meals or to serve Halal meat to the general prison population if it came from the distribution center in place of non-Halal meat. App. at 140, 145. Prisoners further argue that the testimony of various NJSP officials does not support the Prison Officials' contention that providing Halal meals with meat would raise security concerns.

Finally, Prisoners claim that the District Court misapplied the summary judgment standard as to budgetary concerns, arguing that they have submitted sufficient evidence to show that the NJSP could provide Halal meals in a cost-efficient manner. Pointing to evidence that a Halal meal with meat would cost about $ 1.80 more per meal than the cost of a regular meal, they argue that the prison spends $ 3,650 a year per individual to meet its four Jewish prisoners' dietary needs but will not spend $ 280 a year per individual to meet its 225 Muslim prisoners' needs.

According to Prisoners, based on the above evidence, there is at least an issue of material fact as to whether the policy of denying Halal meals with meat is rationally related to a legitimate penological interest. We disagree.

We have no reason to doubt that the District Court carefully considered all of the evidence in the record. It noted that Howard Beyer, former Assistant Commissioner for Operations of the New Jersey Department of Corrections, testified that due to the large Muslim population at NJSP, the addition of Halal meals with meat would cause a considerable disruption to the prison's daily operation. Beyer further testified that the prison does not experience similar disruptions by providing Kosher meals because they provide so few of them. According to Beyer, each Halal meat meal would have to pass through an X-ray machine, one at a time, which would be prohibitively time consuming. Furthermore, as with all things entering the prison, Beyer noted that the Halal meat meals would create additional security concerns.

As to budgetary concerns, Prisoners concede that providing a Halal meal with meat would cost more per prisoner than the vegetarian meal. Furthermore, according to Graves, the vegetarian meals and other special diets cost approximately the same for each prisoner. Graves explained that to stay within the budget, he and other administrators must control "what [they] prepare, cook and serve." App. at 149.

Although Prisoners have pointed to issues of fact in the record regarding these matters, they are not *material* issues of fact under the applicable legal standard. As noted above, Prisoners have the burden of disproving the validity of the regulation. It is not enough to show there are different views as to the relevant issues and underlying facts. Based on the record evidence, we agree with the District Court that providing vegetarian meals, rather than Halal meals with meat, is rationally related to the legitimate penological interests in simplified food service, security, and staying within the prison's budget.

In so concluding, we keep in mind the substantial deference we owe to prison administrators who bear a "significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton, 123 S. Ct. at 2167.* Furthermore, this court has noted that when a challenged regulation implicates security, as it does here, judicial deference is "especially appropriate." *Fraise, 283 F.3d at 516* (affirming district court's grant of summary judgment to prison officials against claims that policy allowing officials to designate "security threat groups" and transfer members of group to special unit violated prisoners' free exercise, equal protection, and due process rights).

## 2. Alternative Means of Expressing Religious Belief

The next *Turner* factor requires us to determine if the prison has provided inmates with alternative avenues through which they can express their religious beliefs. Where a prison affords the inmate alternative means of expressing his or

her religious beliefs, that fact tends to support the conclusion that the regulation -- here providing a vegetarian meal rather than one with meat -- is reasonable. *DeHart, 227 F.3d at 57.*

The District Court concluded that Muslim prisoners have various ways in which to practice their religion. In addition to the pork-free, vegetarian diet, the Court pointed to a weekly congregational prayer service known as the Jumu'ah, the opportunity to study Arabic and to observe Ramadan by providing a special meal enabling Muslims to comply with the holiday's fasting requirement, the opportunity to pray five times during each day, and the chance to observe the five pillars of the Islam faith. The Court further noted that the NJSP accommodates prisoners who celebrate Eid, another Muslim holiday, by allowing them to cook their own meals containing Halal meat.

Prisoners concede they have "some alternative means" of practicing their religion, pointing out the existence of an onsite Imam, the ability to observe religious Holidays, and the weekly prayer service. Instead, they argue that these accommodations cannot be attributed to the NJSP. The District Court rejected these arguments, noting that Prisoners were unable to provide another instance, aside from the lack of Halal meat meals, in which their religious expression was not being accommodated. We agree.

Based on the record and Prisoners' own admissions, it is undisputed that the prison provides Muslim inmates with the opportunity to pray daily, attend special weekly services, and observe religious holidays. Thus, the second *Turner* factor weighs in favor of the Prison Officials.

### 3. Impact of Accommodation on Guards and Other Inmates

Under the third *Turner* factor, we focus on the specific religious practice at issue to determine how accommodating the inmate would impact guards and other inmates. The District Court concluded that it would be difficult for prison administrators and security personnel to accommodate by changing the religious vegetarian meal policy. In response to Prisoners' argument that administrative concerns would dissipate if Halal meat meals were provided to the entire prison population, rather than just Muslims, the Court found that Prisoners failed to present evidence showing the feasibility of providing the meals to the general population. Furthermore, it believed that such an act could be viewed as imposing Islam on the whole prison community. The District Court also pointed to security and budgetary concerns that importing 200 Halal meals would create.

Prisoners argue that the evidence provides a factual issue as to whether the provision of Halal meat meals would affect security, prison administration, or the budget. They rely on their arguments as to the first *Turner* factor, which we have already rejected. They further point out that in his deposition Scott Faunce, the Deputy Commissioner of the New Jersey Department of Corrections, testified that most of the food that comes into NJSP is not scanned. According to Prisoners, if unscanned food comes into the prison without security problems, there is no reason why the NJSP would have to scan Halal meals. Prisoners overlook or ignore Faunce's qualifying statement that while much of the food is not scanned, it is searched. It would be unreasonable for us to conclude that the need to search, rather than scan, hundreds of additional Halal meat meals could not produce security concerns and administrative burdens. The Supreme Court's admonition that we should defer to administrative decisions of prison officials is applicable here.

Prisoners also argue that this case is analogous to our decision in *DeHart,* where we considered claims by an inmate that prison officials had violated his free exercise and equal protection rights by not providing him with a vegetarian diet consistent with his Buddhist beliefs. In that case, we reversed the district court's summary judgment to the prison defendants and remanded so that the district court could more fully develop the record as to the consequences of accommodating the inmate for guards, other inmates, and the allocation of prison resources. *227 F.3d at 59-60.*

In *DeHart,* we concluded that the first and second *Turner* factors weighed in favor of the defendants, noting that denying the inmate's request for a religious vegetarian diet "bears some rational relation" to the penological interests in a simplified food service and in avoiding jealousy among inmates, *id. at 53,* and that the inmate had alternative means of expressing his religious beliefs, *id. at 57.* However, we found the third and fourth factors to be less clear. The crux of our problem with the district court's reasoning as to these factors was its conclusion that the third *Turner* factor proved

14

"neutral" in the face of "no undisputed evidence" concerning the impact of accommodation. *Id. at 57-58*. In such circumstances, we concluded that *Turner* requires a "more thorough analysis of the reasonableness" of the prison regulation when imposed on the plaintiff's religion. *Id. at 59*. We noted that there was already a process in the prison for serving individually prepared therapeutic meals and that the plaintiff had made a prima facie showing that this process could accommodate his religious needs by adding a cup of soy milk. *Id. at 59*.

Prisoners argue that the same reasoning applies in the case at hand. They contend that because there is an existing administrative process under which the Prison Officials can accommodate their desire for Halal meat meals, whatever slight burden the prison must bear is minimal in comparison to that entailed by providing Kosher meals to the Jewish inmates.

Prisoners' arguments are unpersuasive as this case is decisively different from *DeHart*. There are at least two significant distinctions. First, the *DeHart* plaintiff requested only a cup of soy milk to be added to food already purchased by the prison. *Id. at 57*. Here, Prisoners request full Halal meals with meat. Second, the plaintiff in *DeHart* was one person. Here, Prisoners are bringing suit on behalf of more than 200 hundred Muslim prisoners.

The Prison Officials repeatedly return to this latter fact, arguing that the sheer number of prisoners who would be receiving Halal meat meals would be overwhelming across the spectrum, creating administrative, budgetary, and security issues. They point not only to Beyer's testimony but also to that of Roy Hendricks, the Administrator of New Jersey State Prison, who stated:

> From my point of view you are talking about 200 meals, feeding three times a day, additional storage, freezer space for the meals. You are talking about additional officers to check the meals. You are also talking about a cost factor. So I think that's quite a bit. Normally, this institution feeds over 200 -- about 200,000 meals a month, so it would be a problem.

App. at 176.

Contrary to Prisoners' contentions, the record provides us with sufficient evidence supporting the Prison Officials' argument that providing Halal meat meals to hundreds of prisoners would have a marked effect on the prison community. Thus, the third *Turner* factor is far from "neutral" but instead favors the Prison Officials.

### 4. The Absence of Ready Alternatives

As to the fourth and final *Turner* factor, we look to whether there is an absence of "ready alternatives" to the challenged prison regulation, as "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *482 U.S. at 90*. To be sure, this is not a "least restrictive test" in that prison officials do not "have to set up and shoot down every conceivable alternative method" of accommodation. *Id.* If an inmate can point to an alternative that would fully accommodate his or her rights at a "de minimis" cost, we can consider that as evidence that the challenged regulation is unreasonable. *Id. at 90-91*.

The District Court found that the prison could not fully accommodate Prisoners' request for Halal meat meals at a *de minimis* cost and therefore that the fourth *Turner* factor also favored the Prison Officials. As to this factor, Prisoners rely on their previous arguments that the record shows that the provision of the Halal meat meals would not create staffing, security, or budgetary problems. However, as explained above, we fail to find such support in the record. Contrary to Prisoner's contention, there is sufficient evidence supporting the Prison Officials' argument and the District Court's conclusion that providing Halal meat meals cannot be provided at a de minimis cost.

We thus reject Prisoners' free exercise claim.

### C. Equal Protection Claim

15

We next consider Prisoners' claim that the failure to provide them with Halal meat while providing Kosher meals with meat to Jewish inmates violates their rights under the *Equal Protection Clause of the Fourteenth Amendment.* To prevail on an equal protection claim, a plaintiff must present evidence that s/he has been treated differently from persons who are similarly situated. *See City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985). Turner* is equally applicable to Prisoners' equal protection claims. *See DeHart, 227 F.3d at 61.*

The District Court rejected Prisoners' equal protection claims, finding that they had provided no evidence that Jewish prisoners received meat in their Kosher meals. It noted that the record showed that all inmates in need of a religious diet are provided vegetarian meals.

Prisoners argue that in reaching its conclusion, the District Court "had to ignore or misconstrue" the evidence. Br. of Prisoners at 49. For support, they point to a statement from Graves' 1999 certification in which he says, "inmates that require Kosher meals for religious reasons do receive meals that contain meat." App. at 160. However, they fail to acknowledge that during Graves' deposition in 2001, he explicitly retracted that statement:

> I oversighted on the meals, the type of meal . . . Jewish prepared meat. There is no meat. I oversighted on that. There is no meat. These are meatless meals being prepared by the Jewish BT Management. The company supplies the kosher meals. It's meatless.

App. at 128.

Graves' corrective statement corroborates the testimony of others. Specifically, both Hendricks and Beyer testified that the Kosher meals provided to Jewish prisoners do not contain meat.

The record is devoid of any evidence supporting Prisoners' contention that the Kosher meals contain meat. Because all religious meals at NJSP are vegetarian, we reject Prisoners' equal protection claim that the prison treats Jewish and Muslim prisoners in a "disparate and unequal" manner. Br. of Prisoners at 48.

## D. Motion to Exclude Testimony of Scott Faunce

In their final claim, Prisoners argue that the District Court erred by denying their motion to exclude Faunce's testimony. We review a district court's admission of evidence or ruling on a discovery dispute for abuse of discretion. *Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 412 (3d Cir. 2002).*

Prisoners argue that the Prison Officials identified Faunce as a witness almost six months after the close of discovery by attaching Faunce's affidavit to their summary judgment reply brief. This, according to Prisoners, was especially egregious as they had made repeated efforts before the end of discovery to identify persons with knowledge related to their complaint. The District Court denied Prisoners' motion to exclude Faunce's testimony but allowed them to depose Faunce themselves and to amend their previously-filed summary judgment brief. Furthermore, the Prison Officials were ordered to pay Prisoners' costs and counsel fees in connection with the deposition.

Prisoners argue that the submission of Faunce's testimony violates *Federal Rules of Civil Procedure 26 and 37.* Under *Fed. R. Civ. P. 26(e)(2)*, a party is required to supplement its discovery responses if it learns that its initial response is incomplete in a material way and the opposing party does not have the new information. *Fed. R. Civ. P. 37(c)(1)* provides that if a party without substantial justification fails to amend a prior discovery response, it may not use that evidence unless the failure is harmless.

Prisoners contend that the Prison Officials provided no justification for their failure to disclose Faunce and they argue that they suffered harm and prejudice because of the Prison Officials' "complete disregard for their discovery obligations." Br. of Prisoners at 55-56. Also, they claim that the Prison Officials benefitted from reading Prisoners' brief on summary judgment which was prepared before Faunce's testimony was introduced. Lastly, Prisoners argue that Faunce gave an expert opinion and the Prison Officials should have identified him as an expert and provided a report.

16

The Prison Officials rebut any suggestion of bad faith by explaining Faunce was named Deputy Commissioner of the New Jersey Department of Corrections two days after they filed their summary judgment motion and after the close of discovery. Therefore, they could not have identified Faunce as an expert during discovery. They argue that Prisoners were not harmed by the admission of Faunce's testimony as they were permitted to depose Faunce, at the Prison Officials' expense, and were allowed to supplement the record with his deposition testimony and additional briefs.

We are persuaded by the Prison Officials' arguments and conclude that the District Court did not abuse its discretion in allowing Faunce's testimony. Prisoners were given adequate opportunity to depose Faunce and supplement the record themselves. In such a situation, we fail to see how Prisoners suffered harm from the admission of Faunce's testimony.

III.

**CONCLUSION**

For the foregoing reasons, we will affirm the District Court's grant of summary judgment to the Prison Officials.